Good morning, Your Honor. My name is Greg Ryan. I represent the defendant names, the appellants in this case. It's my understanding that the attorney for the Borgers case, which originated in Arizona, waived oral argument and doesn't plan on appearing today. I represent the Blackwell defendants in the action that arose out of the Southern District of California in San Diego. Let me make clear to you the problem that I have so that you can address it. We don't talk about it in advance, so I don't know if I'm just speaking for myself or if others share it. It looks to me as though since a final judgment is being taken from England to California or Arizona, you must, under the law, challenge not the judgment, because we're not the House of Lords. We don't review English judgments. You must challenge the British legal system, and it's an uphill battle because that's where we got the whole idea of due process, and we have Ninth Circuit cases saying the British legal system is just fine. Hard sell. If I have a conceptualized wrong, educate me, and if I don't, show me how you can get over that hump. Thank you, Your Honor. I appreciate the opportunity to clarify that. The cases generally have held, as the Court indicated, that the English system is impartial and it does provide fair tribunes, tribunals, for the trial of cases in England. The problem we have with that, Your Honor, is that, and I should preface my remarks by saying that particular analysis is only applicable to the mandatory nonrecognition grounds. In other words, if a system is impartial or not impartial, then it's mandatory because the judgments will not be considered conclusive in California. The Blackwell defendants do not waive that argument. We will acknowledge that the case law is replete with indications that the English system is fair. Our point when it comes to the system of justice in England is that it's skewed towards Lloyds. In this unique instance, Lloyds has essentially self-regulatory powers that were granted to it by the English Parliament in 1982, which, in essence, tied the hands of the courts in England. They had no ability to challenge the authority of Lloyds to do the things that they did. And so it's not a situation where the ---- Most banking regulation is tilted in favor of preserving the soundness of banks. Insurance regulation in the United States is tilted toward preserving the soundness of insurance companies. And in both banking and insurance law, the government uses a strong arm to force solvent banks or solvent insurance companies basically to take over weak ones very much to the contrary of their owners' interests. Why is this any different? It may not be different, Your Honor. I just point this out because this is a factor in analyzing the judgments that ultimately ---- If I can paraphrase what you're saying, you're essentially saying this really isn't a due process problem. It should be analyzed as a public policy problem. What I'm saying, Your Honor, is that essentially I would ask the Court today to focus not on the due process problem, the proceedings that took place in England, but to ask the Court to focus more on the argument that my clients are making, that these judgments offend the basic public policy of California. That seems like a wise focus because my problem was that this doesn't seem to me to be a due process problem at all because it all traces back to an agreement that your client signed in the general undertaking. So it's really ---- and then my problem, my next problem is that it seems to me that the general undertaking has been upheld in this Court, as I understand it, to the degree that it ---- that there was an agreement to subject your clients, to have any decisions made in the courts of England under the law of England and also under the regulations that Lloyds promulgates. And once ---- unless that is unconscionable or against public policy, and that, as I understand it, is by the boards after our en banc case, I don't understand, you know, where you are after that because everything else is a result of that. That's true, Your Honor. The authority that Lloyds derived to execute the Equitas contract without the consent or even the knowledge of my clients did derive from that general understanding. Right. So why are we asking any questions about the conscionability or unconscionability of the Equitas contract when the Equitas contract was the result of this earlier contract? If that earlier contract was not unconscionable or unenforceable for some reason, why aren't you just finished at that point? Well, because there are two different contracts, Your Honor. The Equitas contract is the contract that Lloyds is suing on. I understand that. But its validity or invalidity seems to trace to the earlier one. Certainly, the first step was the validity of the general undertaking. And ---- The second one really isn't even a contract, right? I mean, it was entered into by agents who weren't appointed by your clients, by somebody else. And the only reason why that worked at all was presumably theoretically because your clients agreed to it. And if they didn't agree to it, I don't ---- you know, there would be no doubt about the fact that it wasn't an agreement and it couldn't have been enforced. But it doesn't matter. I don't see why that matters. My clients didn't agree to it, Your Honor. Are you arguing that they didn't agree to it? I'm sorry, Your Honor. Are you making that argument that they didn't agree to the Forum Selection Clause and to have these cases heard in England? Because that would seem to me to be something that you can't argue anymore. Senator, I think that's not the argument we're making. We're making an argument that they did not agree or consent to the terms of the Equitas contract, which they never saw reviewed. And I'm asking why does that matter, given the earlier agreement and the fact that you're not challenging that earlier agreement? And the earlier agreement did subject the ---- any issues to the courts of England, the law of England, and also to subject your clients to any ---- to regulations and rules promulgated by Lawyers of London. So if you're not challenging that and you can't challenge that, what ---- where's the challenge? The challenge, Your Honor, is simply to the judgments that resulted from that whole process. We're not challenging that the English courts had the authority to do what they did. We're pointing out that what they did was done without our consent, without the client's knowledge. That's the key point for our attack here. Our argument in very basic terms is that under the California Recognition Act, we now take a fresh look at these judgments. And we decide one simple issue, and that is, are they in accord with California public policy, or do they offend California's notion of public policy?  And why do they? It offends the notion of public policy in California to have judgments that were procured in essence without providing the names an opportunity to raise a particular issue, and that's the issue of fraudulent concealment. That is a defense that the names have here in California, but did not have under English law. I recognize that I'm arguing that there's a difference in the law between England and the United States that deprive my clients of a defense. Well, is there a difference between England and the United States as to the question of whether if they agreed to this in advance, which they did, they could ---- it could be enforced? In other words, it isn't the courts of England that were imposing this. It was as a result of an earlier agreement to follow whatever Lloyd said, and this is what Lloyd said. The courts of England didn't come up with this idea by themselves, right? I'm sorry, Your Honor? The courts of England did not come up with this preclusion. It was traceable indirectly to the general undertaking. And to Lloyd's Act of 1982. Okay. The statute and the undertaking, it reminds me a lot of our previous en banc. The Richards case, Your Honor? And I would like to point out that and clarify that in the Richards case, there was a presumption of the court that the names would obtain in England a process that was fair. And I believe it's clear that the court in that case assumed that the names were going to be able to raise a defense of fraudulent concealment. I'm on a different track from you, and the trains are just passing each other by. Okay. You're asking us to examine whether it's fair that you're not allowed to raise fraudulent concealment as a defense or counterclaim in the way that you otherwise would be. That's right, Your Honor. In a California court. And I'm thinking that isn't the question. I'm thinking the kinds of contracts that won't be enforced because they violate public policy would be things like a contract that after your daughter is born and she grows up, you will give her to me in marriage. Your children will be given to somebody else's slaves. Possibly gambling contracts. So I don't know if they're against public policy anymore now that there's so much legal gambling. These extreme sorts of contracts that civilized nations would not allow people to agree to. And I can't see that there's any barrier to civilized nations allowing people to agree to put this defense here instead of there or to sacrifice various individual economic interests in order to favor the soundness of insurance coverages. It seems like it's not in the same category as the contracts against public policy that won't be enforced despite the judgment of another nation's courts that grant due process of law. A separate issue from the contract, Your Honor? Yes. And the issue of the unconscionability of the contract. There are two categories here where you can avoid enforcement of a foreign judgment. And the first one is where the courts there are not civilized courts that grant litigants due process of law. Though you have not conceded it, you've recognized that that's not your strongest argument. And the second category is contracts that are so contrary to public policy that they will not be enforced despite the judgment of courts that do grant due process of law. That is your primary focus, as I understand it. But the dispute about public policy that you raise strikes me as not in the same category, not in the same ballpark as the kind of contrary to public policy contracts that won't get enforced. A FOT law to kill Salman Rushdie, that would not be enforced if it were something that was contractual and approved by the courts of the nation that grant it due process. That would be contrary to public policy. From what? And these other examples. Those are the sorts of things. Correct, Your Honor. From my research, generally we're talking about gambling contracts. We're talking about First Amendment rights and libel or defamation cases. Typically the English judgments for libel and defamation are not recognized in this country because of the difference in the law. But what you're talking about, as I understand it, you're basically making an unconscionability argument under California law, analogous to something like Armendariz or something like that. And your best argument seemed to be that this was both procedurally and substantively unconscionable. And it's an attractive argument, except to me for the fact that this contract that you're focusing on is the Equitas contract. And if it had stood by itself, if just out of the blue Lloyds had said, you know, I think we're going to appoint somebody to be your agent who you haven't appointed and we're going to have this person enter into a contract without asking you, putting, waiving your rights here and your rights there, you might have something except for the fact that this was all the result of the earlier agreement. That's where I get stuck. It does go back to the original agreement, Justice Bresant. It does focus on the general undertaking. And we just disagree that when they signed the general undertaking, they could have possibly contemplated that they were going to be railroaded the way that they were or that they could have foreseen that this was going to happen. Why? Because they were not told about the quarters in the pipeline. When they signed that general undertaking, in terms of the undertaking, we don't have a problem with it. We're not arguing that point. What we are arguing is that, and it's virtually undisputed by Lloyds, this whole scenario of these terrible losses, the massive losses that were known by the insiders at Lloyds, Lloyds deliberately not disclosed to the names in their ROTA meetings before they signed their general undertaking. But that you were not precluded from litigating that issue in England under the laws of England, but you didn't. We were. You weren't precluded. You weren't precluded from raising it as a counterclaim, but you weren't precluded from litigating it. No, Your Honor. We were precluded from raising the issue of fraudulent concealment because England does not recognize the cause of action for fraudulent nondisclosure. And that's our case. It's just that you couldn't raise it as a defense to the action. The idea was the policyholders get the coverage in these huge environmental and asbestos liabilities, and then you're free in separate lawsuits to fight it out with the people that persuaded your clients to become names. The problem is first they have to pay the money so that the policyholders and the plaintiffs get their money. So the insurance stays good, and then the investors fight it out. Isn't that the scheme? That's correct, Your Honor. But that's the procedural part of it. The substance of the fraud. So you didn't lose your ability to get a remedy for the fraud if there was fraud. We did. That's our argument. And our argument is that we never once had an opportunity because of the nature of English law on fraudulent nondisclosure to raise that. But you're not. I mean, first of all, that is largely, again, the result of the earlier lawsuit, Richards. I mean, that's really what was at the core of the Richards lawsuit, right, the fact the difference between Federal securities law and English fraud law. And so once that case was over, the fact that that difference was going to exist was a result of that determination. Is that not right? That's correct. You're not claiming it's unconscionable that England has a different law than California with regard to nature of fraud. I don't argue that. What I argue, Your Honor, is that at the Richards court, when they sent my clients and other names to England, presumed that they were going to have adequate remedies. But they didn't presume that there was going to be a cause of action for fraudulent nondisclosure. They knew there wasn't. That was the whole fight. No, Your Honor. The Lloyds – I'm sorry. The Richards court, and I'm reading from the opinion, the names contend that entities using the Lloyds trade name willfully and fraudulently concealed massive long-tail liabilities in order to induce them to join syndicates. If so, we have been cited to no authority that Lloyds partial immunity would bar recovery. In the event, Lloyds immunity did bar recovery for the names claims of nondisclosure. Quite clearly, in the Jaffray court, I mean, the – It was because it was Lloyds or it was because it was – that's the law of England. That's the law of England. Not because it was Lloyds, just because England doesn't have a cause of action for fraudulent nondisclosure. That's right. And that presents the issue here, which is, does – I'm sorry, Your Honor. Does that difference in English law and California law trigger the public policy exception to the Recognition Act? And our position is essentially that it triggers the Recognition Act public policy exception. It's so important that the names be protected or any California citizen be protected from a fraudulent nondisclosure in the sale of securities that this is an instance where California public policy should preclude the enforcement of these judgments. Thank you, counsel. Good morning, Your Honors. I'm Stephen Alexander with Fried Frank, Herr, Shriver, and Jacobson, and I represent the Society of Lloyds here. I'm not going to address, unless Your Honors have any questions, the issue of whether or not England provides fair tribunals. I think it's pretty clear. Well, I have a general question. Sure. I have the instinct and a little bit of evidence that the statement that we're only looking at systems is a bit of an overstatement. I mean, if somebody came in here with a judgment that was obtained by drawing and quartering or by jousting, I assume that the fact that every other court in England doesn't operate that way would not preclude us from saying this is a violation of due process and we're not going to enforce it. Well, I think, first of all. Of international due process. Your Honor, first of all, that's not the facts of this case. I understand that. But I'm just testing. And secondly, I. I mean, I was somewhat disturbed to read. Everybody keeps repeating this thing about the system. But except in these Lloyd's cases, in fact, the courts do seem to look at the particular case. And it's sort of no wonder. Well, Your Honor, obviously, if a particular court under that system acted in a way contrary to the system of that court, first of all, you would assume, as is in the case in England, that there are appellate courts and we can go all the way to the House of Lords and they would have overruled that type of situation. But let's just assume for the sake of argument here, and I'll be very brief in this, that you could go beyond the system. Look at what happened here. Look at the litigation that went on here, the due process. Well, I mean, the reason this matters is because we may or may not write an opinion in this case. If we do write an opinion in a case, we may have to take a position on that subject, i.e., whether it really is true that we only look at the system and we don't look at all at the particular case. But even if you were to look at the system, as the courts and the circuit courts that have already decided, the same issue has risen, as you're well aware, in a number of cases. They've all come down exactly the same way. And look at the proceedings. The appellate record in, just the appellate record on the affirmance of these judgments went on, the hearings went on for days. We have 20 minutes here, Your Honor. There were days of appellate arguments on the very issue of the sue now, pay later, or the other issues that they complain about. Those issues were raised. Not that they didn't have an ability to raise those issues in the English courts. They raised them in hundreds of pages of briefs in literally hours of argument. They lost. We might call that undue processing. Yeah. I hate to think of it. If you permitted that kind of argument on every issue here where, you know, there's a lot of money at stake and there's a lot of money at stake in this case, I don't know that the Ninth Circle would issue very many opinions at all. So even if you went beyond... They got the days of oral argument on appeal? Yeah. You're not talking fraud? Literally days. I'm talking about days. They don't do briefs, right? They just did. I've seen this. It's very interesting to watch. You know, so I really, you know, want to turn to the one thing that I find troubling. There are two things that were said that I really find troubling. One is that Loyce has never denied that they engaged in fraud. That is just flat-out untrue. What is important here is to distinguish between Loyce, the Society of Loyce, which is the regulatory agency and the undertaking that was given that Your Honors have all talked about is an undertaking that submits these people and they had to go to England, as the Richards Court found. It's not a trivial act. You have to go to England, physically to England, to sign that, to understand that you're submitting... I remember discussing that in the Richards oral argument. Let me ask you something about Loyce. If I understand it right, Loyce is not like a company. Loyce is kind of like the state insurance commissioner. It is. The closest analogy, probably in the United States that's not a perfect analogy, is the New York Stock Exchange. I can see that. You know, it's a self-regulatory agency. It's, as the New York Stock Exchange, it's a very special statute that, as we've now found out, has special rules about how much you can compensate people. But it's a special statute and it is designed to regulate a marketplace. Okay? And it is true, as this Court recognized in the bond, and I'm quoting from the language, while it is true that the Loyce Act immunizes Loyce from many actions possible under our securities laws, Loyce is not immune from the consequences of actions committed in bad faith, including fraud. And that is, in fact, the case. And they don't deny that. What the part that Mr. Ryan cited it said is the names contend that entities using the Loyce trade name willfully, fraudulently concealed massive, long-tail liabilities. The key word there is entities using. That's not Loyce. Their claim was that managing agents, brokers, and others that said they were associated with Loyce committed some kind of fraud. And he claims that this Court, in Richards, assumed that there would be some remedy for that. Yes, it did assume that and it was correct, as the Court said. Quote, I'm quoting from Richards, We disagree with the dramatic assertion that the available English remedies are not adequate substitutes for the firm shields and finely honed sworns provided by American securities laws. The names have recourse against both the member and managing agents for fraud, breach of fiduciary duty, or negligent misrepresentation. Indeed, English courts have already awarded substantial judgments to some of the other names. In other words, the people that were allegedly using the trade name were, in fact, subject to litigation. The Court knew that that was that they had those rights. And indeed, they had the right to sue, as Your Honor has pointed out, separately Loyce, the Society of Loyce. And some of the names did. In Jaffrey, they sued. Not these particular names. And it went on for days of trial. It went on for days of appellate argument. And the Court ultimately found that Loyce itself did not engage in fraud under the English system. What about the managing agents? The managing agents are not Loyce. They are separate entities. Right. But have there been lawsuits against them? There were lawsuits against them. That's exactly what the Ninth Circuit said. Where the Court's fine. Where the Court's fine. That was Jaffrey. That's not Jaffrey. Jaffrey is Loyce. Again, you have to separate the entities. I understand that part. But what about lawsuits against the managing agents? Those were brought. Those were brought. Names brought them. And substantial judgments were obtained. Some of them were obviously, as is the case in, you know, some were bankrupt. Some of the judgments exceeded their net worth. And some of the judgments were uncollectible. Again, a fact recognized that some managing agents were successfully sued. Sure. As this Court recognized. Because there were judgments even as of the time that the Richards case came here. Nobody has a right under public policy to have the defendant they sue have enough money to pay. Right. Or to say, again, if you use the analogy, it would be sort of like saying, and I believe it actually is the law in New York, you cannot sue for certain types of New York Stock Exchange. They're a regulator. But you can sue members of the New York Stock Exchange. They get sued all the time. Goldman Sachs. Merrill Lynch. Some of them I actually represent. But that's a different lawsuit. And the fact that they had claims against third parties, which they could have brought, and in many cases did bring, doesn't mean that it somehow violates public policy. Well, what about leaving that one aside? I mean, it seems to me in some ways a more substantial issue here is the fact that they couldn't challenge the amount of the so-called premium except for manifest error, and they couldn't get any discovery to find out if it was manifest error. Let's talk about it. First of all, discovery has never been held to be a fundamental right of public policy. Right. I mean, many, many countries have different views about discovery. But let's talk about specifically the so-called manifest error. Basically, what happened here, Your Honor, is the regulatory agencies, which in this particular case, Lloyds is a self-regulatory agency and the Department of Trade and Insurance in England, when there was this crisis in the Lloyds market, developed a, if you will, it was called reconstruction and renewal. It's sort of like the bank types of things where regulators step in. And what they said is we are going, there were two problems. One, beneficiaries of these insurance policies can affect each of these names through managing agents and syndicates wrote insurance policies to ensure risk. So Lloyds, properly so, and the Department of Trade and Industry in England were concerned with policyholders, their number one concern that they get paid. A second concern is since unlike insurance companies in the United States where your liability is limited to your capitalization or your maximum policy limits, these people had unlimited personal liability. That's the nature of Lloyds in being a name. So they said we're going to re-insure all these risks. We're going to create this new company and we're going to re-insure all these risks. And we're going to come up with a premium that will, based on the actuarial studies done at that time, projecting out what the cost of asbestos liability, not an easy task, and we're going to allocate that premium to everybody at Lloyds, every name that has it, and it's going to extinguish their liability. So what the manifest error says is Lloyds is required with the Department of Insurance to come up with actuarial studies to figure out what the appropriate premium should be for this re-insurance, to re-insure these risks that all the names had to ensure that policyholders get paid. And the manifest error says once Lloyds meets the evidentiary standards of the court, and by the way, they challenge that provision. These names challenge that provision. One of the issues in the court in England, before these judgements were entered, was whether or not a Lloyds had the authority to do it, and b, whether or not this manifest error provision was appropriate. They litigated that all the way to the appellate court. It was upheld, so they had a right to challenge that, and indeed changes were made. Manifest error says what you really as an individual name are limited to, once Lloyds establishes the validity of the process, which was done in conjunction with the government of England to ensure that there were good, sound actuarial studies done at the time, that somehow they've calculated your portion wrong. In other words, they say you're in five syndicates, you're really only in three syndicates, or your percentage of the syndicates was X. You could come and show that the way they had allocated that premium to you was wrong. There were errors. So they that of course, you know due process, that's not an unreasonable scheme for a country to adopt in a crisis to say that your rights are going to be limited to showing that there's manifest error. We have different evidentiary standards here in the United States. We have clear and convincing evidence. We have preponderance of the evidence. I don't think it avoids public policy if you have a fair tribunal to say that the evidentiary standards as to what you can show and what you can't show are going to be different than here. Particularly where you can challenge those standards, which they had the right to do. In effect, what they're really saying is they shouldn't have to pay the fair share of the premiums that have protected them from their unlimited liability. Because Equitas has been paying the claims. They've gotten a free ride all these years. And now the judgements have been added. I remember when I studied this in the Richards case the way it used to work before the huge liabilities of the environmental cases and the asbestos cases was Lloyds would sign up as names rich people and aristocrats in England. They'd never put up any money. They'd never write a check and they'd just get periodic checks for large amounts of money. Their share of the premiums. Essentially what they were doing was making the insurance solvent by pledging their great fortunes. And as long as the underwriting was done soundly their great fortunes were never invaded. Then the asbestos and pollution liabilities hit and the great fortunes were invaded. Now if I understand it what Equitas is all about is protecting those great fortunes by obtaining reinsurance to a much more adequate degree than the various underwriters that Lloyds used to. Have I got the history and the scheme right? In general yes. First of all Lloyds didn't sign up people but Lloyds is just underwriters that Lloyds used to sign up people but and for a long time it was profitable. That doesn't mean every syndicate in every year was profitable. You know if you go back to Sure it's business. Well originally Lloyds was insured ships and as long as the ships were trying their cargoes intact The idea was instead of investing money to get profit you pledge your creditworthiness to get profit. Well people didn't have to actually what happened in most of these names here not only did you have to sign a general undertaking you had to go through a credit check to make sure that you actually could stand behind and you had to issue letters of credit and what people what were on deposit to backstop that were letters of credit. The problem that arose in the late 80s with the environmental liability and asbestos liability frankly largely in California as a matter of fact was that Lloyds would close their books and so every three years you know you have a syndicate you go out three years at the end of three years if you're talking about ships when you were insuring ships by the end of three years you knew where the ships sunk whether the cargo was lost you could close the books and if it didn't you collected your premiums and you rolled them over and you know for most years it was profitable. The problem that occurred with environmental liabilities and various court decisions about how to read policies is at the end of three years nobody could it became a time where actuarial people had difficulty calculating what that tail liability was it wasn't just like a ship it either not sunk or sunk and so as those calculations became more difficult they couldn't and what Lloyds previously did with that tail is you reinsured it in other words new syndicates reinsured that tail portion of liability what happened in the crisis is it became difficult to reinsure that but we're sort of beyond I think The one thing I find odd here which doesn't necessarily have any legal consequences is this Equitas Agreement I mean it doesn't look like in terms of being an agreement it doesn't look like any other agreement because the agents were appointed for the names who then entered into agreements on their behalf without their consent and really my question is why they do that what was the point of that if the general undertaking said and the only reason I'm asking this is because the plaintiffs have focused on that agreement as if it matters that it was an agreement or purported to be an agreement and I'm sort of baffled by why it even purports to be an agreement since the general undertaking says they have to abide by Lloyds rules and regulations and why couldn't Lloyds just say this without going through the charade of having an agreement that isn't an agreement Well I think the answer to that question really is how the English regulators which really imposed this system and then directed and Lloyds as a self-regulatory agency was the one that implemented it You're right, in effect what people were told is that you have to buy reinsurance and you're required to buy reinsurance See the only reason this matters is because we're all here focusing on this purported agreement and questioning and the argument that's being made is that this agreement is against public policy in California but it's not even an agreement I mean if we just recognized it wasn't an agreement the whole analysis would be a lot clearer Well I mean the agents were appointed and people were required to pay their premiums and it was it was put forth as a settlement offer and 95% Well for the people who took it it was an agreement but for the people who didn't take it it wasn't an agreement If you didn't take it then you were in the fault It was worse than a contract of adhesion, it wasn't a contract because it hadn't been agreed to by the people who were in any form by the people who were being bound by it The regulators made the judgment in England which is the regulatory scheme to which as you properly pointed out Your Honor, they willingly submitted themselves to Could they have done it a different way? Could they have called it? I don't think the effect is any different I guess I'm suggesting that a lot of the reason why we've gone through all this litigation for all these years over this is because it purported to be and it looked it called itself an agreement But the basic fact as Your Honor has said these people submitted themselves to an international contract that contract was the undertaking that is the very contract that this court dealt with on these same issues exactly the securities laws issues were raised in Richards and the whole policy that underlies the Richards decision and the United States Supreme Court decisions on which Richards relies will fall by the wayside if you adopt the claims because we really then will be saying because we sent them to England and said you have to litigate your fraud claims we said you have to litigate them if we now say when under those agreements having gone to England valid and judgments won't be enforced here because our evidentiary laws or our substantive laws differ in some way that is not a fundamental public policy then we are really saying it is only our law that counts Let me ask you a question did prior to Equitas did the names generally have reinsurance or not? The answer is that generally when they closed it out Lloyd's syndicates, the new syndicates for the new years reinsured part of the tail before so it was just all done within Lloyd's Historically that's true you could also purchase reinsurance separately and individually but the problem is the problem is the time of this crisis that led to reconstruction and renewal there really wasn't any reinsurance for this type of liability It's interesting because actually I represented Cigna and that was part of the litigation was the layers of reinsurance that the American companies all had and the policy periods I understand exactly what I mean we're not saying that there weren't some people because there were judgements that committed some kinds of fraud they were managing agents and there were judgements but the real problem that gave rise to this is it became impossible I'm sure if you go back to the actuarial studies when this took place back in the 90's and compared them to what's been paid out in asbestos liability I'm not so sure that we have a handle on that today and that's not fraud that's really not fraud Was there was the old technique basically that at the end of three years some agent would try to round up a new bunch of underwriters who would essentially take a premium in exchange for insuring the tail then the investors who would be willing to take a premium to insure or provide reinsurance for the tail became unavailable because of the unpredictability of the tail It's a little more complicated than that in general they were required in England more so than here accounting firms particularly the deal with insurance are both accounting for financial accounting but actuarial because actuarial and at the end of the period generally a three year period they were required to try and place an actuarial sort of if you will value on that tail the informed tail and that's a process they had to go through and there were regulations that governed that and as you proceed along in fact it became more difficult to do that and as those premiums grew and it became more difficult to do that people were unwilling to in effect take that reinsurance risk so it's a two part problem it's more difficult to do because you're in some ways predicting what the value of an asbestos claim would be and how the United States courts would read insurance policies that have been reinsured and that's not exactly a science unless you have any other questions your honor thank you counsel we ran through your time but why don't you take a minute or two for rebuttal anyway did your clients ever sue any of the managing agents I can't answer that question your honor I don't know I believe that some of them did but again it's my understanding that in English law it's not a cause of action for fraudulent nondisclosure the action against managing agents were for breach of fiduciary duty and for misrepresentation I did not understand until your argument now and maybe I missed it that the focus of your public policy argument was on the difference between fraud law in the United States and in California I thought it was essentially on the presence in the Equitas agreement of the pay now sue later and the manifest error clause and not on the substantive question of the difference in the fraud law am I wrong about that no your honor the two legs to our public policy argument are the unconscionability of the Equitas contract and the difference between California law and English law on fraud I see and just two points to respond to Lloyd's counsel first of all Lloyd's as a market entity divorced from the facts and circumstances of this case it's important to remember that Lloyd's is suing the names as an assignee on the Equitas contract not as some separate entity or some market regulator secondly the settlement offer or what's described as a settlement offer that's part of the Equitas program and my clients getting a free ride my clients get a free ride a little bit like the Enron investors are getting a free ride these days the settlement offer and this can be found in the excerpts of record at 764 provides it's not within the power of Lloyd's to grant names an absolute release from their liabilities to policyholders despite the reserve strengthening agreed with the DTI and the board of Equitas there will still be a residual risk for names of failure by Equitas to pay in full liabilities in respect to the 1992 and prior business in short my clients are stuck with Lloyd's in a marriage forever and they want out and they can't get any sort of under this settlement offer you become an underwriter of an insurance policy isn't it that's right for the 1992 and prior policy what liabilities come you're on the hook for I'm sorry your on why is this different why is this more unfair than a state that did not formally require drivers to have liability insurance going to a new system and saying you can't keep your license unless you get automobile liability insurance people say I already have my license I'm entitled to keep it the state legislature says not unless you buy liability insurance they say I got all kinds of problems buying liability insurance it's too expensive I have a drunk driving conviction it's really really expensive tough it seems to me this is that sort of regulatory imposition I don't see what's the matter with it not actually your honor why not the analysis that the court just went through involves a balance of risks pluses and negatives that analysis wasn't provided to the names when the names said we're not interested we don't trust Lloyd's we're not going to buy or pay premiums for the Equitas reinsurance you've got to say that before you invest in Lloyd's once you put yourself down as a name at Lloyd's you have put your whole fortune at risk that's correct and everybody knows it and that's correct and that's why the devastating effect of the nondisclosure the names purchased insurance from the I'm sorry they didn't purchase insurance they devoted their capital to back these policies at syndicates basically they sold insurance year by year by year by year each year was a different venture I may sign on for a syndicate this year and be on a totally different syndicate next year and as counsel indicated the problem comes up that when they reinsure to close it's a cycle of three years and so you don't even know that there's going to be a loss until three and a half years after the one year venture and in this case it built slowly over the years and in the early 80s they knew there was a problem they established a working party to try to deal with it and recommend solutions but by the late 80s they knew this was out of control and that it threatened Lloyd's and they told no one and my clients are buying year by year by year into new they're opposing counsel trying to draw a distinction as to who the they was and his contention was that Lloyd's was not making representations to anybody it was managing agents and underwriters and so on and that those people were still involved when I say they knew, your honor I'm talking about the insiders right at the top I'm talking about the chairman and the deputy chairman in fact if the court reads the opening was it Lloyd's that was it that group that was interacting with the names that's what I don't understand who was interacting with the names in terms of providing information to them the insiders at Lloyd's interacted with the names in one instance and that was essentially at the ROTA meeting when they became names and a deliberate decision was made by the chairman at Lloyd's I just did look all the way through your briefs and I do not see any argument and I understand why it's because I think Richard concludes the argument I don't see any substantive argument that the unconscionability was the difference was the lack of availability of a fraudulent non-disclosure cause of action it's not there I just looked the argument of unconscionability is based on what was in the Equitas contract and not what the law of England was so this whole argument doesn't seem to have been raised here I believe we did raise the fraud argument Your Honor I'll just look for it carefully Thank you Your Honor Thank you very much Counsel Lloyd's v. Borgers is submitted and Lloyd's v. Blackwell is submitted We'll hear FDIC v. Fidelity and Fossett Thank you
judges: Kleinfeld, Wardlaw,berzon